NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0611n.06
Filed: August 21, 2006

**No. 05-6166**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

CLEOPHUS TRIBBLE,

     **Plaintiff-Appellant,**

v.

MEMPHIS CITY SCHOOLS,

     **Defendant-Appellee.**

                                  /

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE**

_____

BEFORE:    BATCHELDER, CLAY, and ROGERS, Circuit Judges.

     **CLAY, Circuit Judge.** Plaintiff Cleophus Tribble appeals from the May 19, 2005 judgment of the United States District Court for the Western District of Tennessee, granting Defendant Memphis City Schools summary judgment in Plaintiff's suit under Title VII of the Civil Rights Act of 1964, 28 U.S.C. § 2000e *et seq.*, for racial discrimination in connection with Plaintiff's termination from his position as Military Instructor for Defendant's Junior Reserves Officer Training Corps ("JROTC"). Plaintiff argues that the district court erred in finding that Plaintiff had failed to present a *prima facie* case of race discrimination, and that the district court further erred by finding,

-1-

in the alternative, that Plaintiff had failed to offer sufficient evidence that Defendant's rationale for the termination was pretextual.

Because we find that Plaintiff failed to make out a *prima facie* case of discrimination in the court below, we **AFFIRM** the district court's grant of summary judgment for Defendant.

## I.

## BACKGROUND

### A. Procedural History

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on September 12, 2001, alleging that he had been the victim of racial discrimination in connection with his June 5, 2001 termination from Memphis City Schools. The EEOC issued a notice of dismissal and right to sue letter on September 19, 2002. Plaintiff thereafter filed the instant complaint, *pro se*, on December 12, 2002. Plaintiff subsequently procured counsel.

Defendant filed a motion for summary judgment on April 4, 2005. The district court granted Defendant's motion by order dated May 19, 2005. On May 31, 2005 Plaintiff filed a Rule 59 motion to reopen or amend the judgment, which the district court denied on July 7, 2005. Plaintiff filed a timely notice of appeal on July 22, 2005.

### B. Substantive Facts

Defendant school system runs a JROTC program in its schools. Each school with a JROTC program has a Military Instructor ("MI") and a Supervisor of Army Instruction ("SAI"). The MI answers to both the SAI and the school principal. In addition, the JROTC program is overseen by a Director of Army Instruction ("DAI"), who maintains offices at the local JROTC headquarters. All JROTC personnel are retired military, are certified by the Department of the Army, and are

subject to certain Army regulations. Defendant hires JROTC instructors upon certification and recommendation by the Department of the Army. Sole authority for hiring, disciplining, and firing JROTC personnel at all time rested with Defendant school system. On August 23, 2000, retired U.S. Army Lieutenant Colonel John G. Winchell became the DAI for Memphis City Schools. Plaintiff retired from the United States Army in 1993 as a Sergeant First Class, and shortly thereafter obtained his JROTC certification. Defendant school system hired Plaintiff in January 1994 as a Military Instructor for Defendant's JROTC program. Upon his hire, Defendant assigned Plaintiff as MI for Craigmont High School.

At the start of the 2000-2001 school year, Plaintiff was in his position as MI at Craigmont High School. No SAI was assigned to Craigmont at the start of the school year. According to Defendant, the JROTC program at Craigmont was experiencing difficulties. Winchell stated in his affidavit that Craigmont's principal had repeatedly contacted Winchell in the initial months of the school year about her frustrations with the JROTC program at Craigmont. Winchell stated that the principal believed that the students were not responsive to Plaintiff, and that Plaintiff had difficulty with discipline, having sent too many children to the office for disciplinary problems.

On November 27, 2000, Lieutenant Colonel Richard Olson was assigned to Craigmont as the SAI. Olsen began counseling Plaintiff on his classroom management, instructional skills, and adherence to the uniform policy. Winchell reports that Plaintiff was frequently insubordinate to Olsen and nonresponsive to counseling. During one incident in which Olsen asked Plaintiff to remove a non-uniform jacket Plaintiff had been wearing over his uniform, Plaintiff challenged Olsen's authority in front of students, and the next day asked Olsen to "stop being such an asshole." Olsen found that Plaintiff would often yell or threaten his students in lieu of utilizing positive

-3-

techniques to motivate them. In particular, Olsen reported that Plaintiff "would tell me in front of the students that they were bad kids and little or nothing could be done with them." (J.A. at 21.) Near the end of the Fall semester, Olsen and the principal at Craigmont recommended that Plaintiff be removed from his instructional position at Craigmont. Olsen recommended that Plaintiff not be in a position to interact with students.

Winchell reassigned Plaintiff to Kingsbury High School for the Spring 2001 semester. Kingsbury's SAI, Jesse Carpenter, had acted as the SAI at Kingsbury since 1993. In his affidavit, Carpenter states that he reported to Winchell that Plaintiff had the same difficulties with classroom management and instructional style at Kingsbury as he had at Craigmont. Carpenter reported that Plaintiff had an unusual number of disciplinary problems with his students. Carpenter also reported that Plaintiff would often yell at and demean students in his efforts to gain control of his classroom. Winchell reported that he met with Plaintiff and Carpenter at Winchell's office on March 1, 2001 to counsel Plaintiff on his classroom skills. Winchell reported that Plaintiff "blamed his students for his difficulties." (J.A. at 38.) Following this meeting, Winchell prepared a memorandum of counseling to document the meeting, which appears in the record. On March 2, 2001 Carpenter reported in his affidavit that a student had come to Carpenter and complained that Plaintiff had "thrown a desk at him." (J.A. at 43.) When Carpenter questioned Plaintiff about the incident, Plaintiff admitted to dropping a desk on the floor to get the students' attention. Carpenter informed Plaintiff that dropping a desk was not proper classroom behavior for an instructor. Carpenter found Plaintiff unwilling to accept constructive criticism or attempt to change his classroom demeanor.

Plaintiff takes issue with Winchell's and Carpenters' assertions that they counseled Plaintiff to improve his classroom demeanor. Plaintiff points out that there are no contemporaneous

documents to serve as evidence of these purported counseling sessions. Plaintiff also disputes the validity of the March 1, 2001 memorandum of counseling, arguing that it refers to an incident which Winchell and Hooker state did not occur until March 26, 2001. Plaintiff notes that JROTC policy requires proper documentation of disciplinary measures and the use of a formal investigative process when a complaint is made against an instructor.

Alex Hooker, the principal at Kingsbury, also reported difficulties with Plaintiff. Hooker reported a March 26, 2000 incident in which Hooker witnessed Plaintiff running across the school athletic field toward three students while yelling at them. Hooker reported meeting with Plaintiff and SAI Carpenter on March 27, 2000 to discuss the incident. After Hooker told Plaintiff that the observed behavior was unacceptable, Hooker says that Plaintiff informed Hooker that, given the same circumstances, Plaintiff would do the same thing again. After the meeting, Hooker informed Carpenter that Plaintiff's classroom management skills would need significant improvement were Hooker to keep Plaintiff at Kingsbury past the end of the school year. On May 22, 2001 Hooker sent an email to Winchell, saying that Hooker did not believe that Plaintiff had improved his classroom management skills and asking that Plaintiff be reassigned away from Kingsbury High School. Carpenter also recommended that Plaintiff be decertified as a JROTC instructor. Thereafter, Winchell met with Plaintiff, asked Plaintiff to resign, and told Plaintiff that if he did not resign, Winchell would recommend that Memphis City Schools terminate Plaintiff's employment. Plaintiff refused to resign, and Memphis City Schools did terminate his employment, effective June 5, 2001.

## II.

## DISCUSSION

### A. Standard of Review

-5-

This Court reviews a district court's grant of summary judgment *de novo*. *See DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute as to a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). As the party moving for summary judgment, Defendant bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Plaintiff's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In considering Defendant's motion for summary judgment, this Court accepts Plaintiff's evidence as true and draws all reasonable inferences in his favor. *Id.* If, as the nonmoving party, however, Plaintiff fails to make a sufficient showing on an essential element of the case with respect to which he has the burden, Defendant is entitled to summary judgment as a matter of law. *Celotex*, 477 U.S. at 322-23.

**B.    Title VII Evidentiary Framework**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "because of . . . race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In Title VII cases, a plaintiff bears the ultimate burden of persuading the factfinder that the defendant intentionally discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Unlawful discrimination need not be the only reason for an adverse employment action, but rather need only be an essential component of an employer's mixed motive. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240-41 (1989). A plaintiff may carry the burden for summary judgment by

introducing direct evidence which shows that in treating a plaintiff adversely, the defendant was motivated by discriminatory intent, or by introducing circumstantial evidence that supports an inference of discrimination. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566-67 (6th Cir. 2001).

Where, as here, Plaintiff's evidence is circumstantial, a disparate treatment claim proceeds through a three-step framework. First, Plaintiff must present a *prima facie* case. Plaintiff may establish a *prima facie* case of discrimination by showing (1) that he was a member of a protected class; (2) that he was qualified for the position from which he was discharged; (3) that he was discharged (*i.e.*, that he suffered and adverse employment action); and (4) that he was replaced by someone outside of his protected class or that other, similarly situated employees outside of his protected class were treated better. *See Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 729 (6th Cir. 1999). The *prima facie* test is meant to be a relatively light burden. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (stating that in a Title VII case, "the burden of establishing a *prima facie* case of disparate treatment is not onerous").

## C. Plaintiff Fails to Present a *Prima Facie* Case of Discrimination

The parties agree that Plaintiff, as a black man, is a member of a protected class and that he was qualified for the position of JROTC instructor. The parties further agree that Plaintiff's termination was an adverse employment action, as that term is understood in Title VII case law. The parties disagree, however, as to whether Plaintiff has completed his *prima facie* case of racial discrimination by showing that he was either replaced by an instructor outside of his protected class or that another, similarly situated instructor outside of Plaintiff's protected class was treated more favorably than Plaintiff. Because Plaintiff does not argue that he was replaced by an employee

outside his protected class, Plaintiff relies on a similarly situated analysis in his attempt to complete his *prima facie* case.

### 1. Legal Requirements for Similarly Situated Employees

> In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are "nearly identical" to those of the [non-protected] employees who he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances.

*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (internal quotations and citations omitted). In cases such as the instant case in which the plaintiff alleges disparate disciplinary actions, "the individual[] with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

### 2. Plaintiff's Evidence of a Similarly Situated Instructor

To complete his *prima facie* case, Plaintiff relies entirely on the allegedly more favorable treatment received by a Lt. Col. Stuart, an SAI in the Memphis JROTC program at another Memphis high school. Lt. Col. Stuart was terminated by Memphis City Schools in January 2002 after Winchell recommended that the school system terminate his employment. Plaintiff alleges that Stuart received more opportunities to correct his behavior than did Plaintiff, and that Stuart was therefore more favorably treated.

Plaintiff alleges that Stuart and Plaintiff carried out substantially similar duties during the Fall of 2000 while Plaintiff worked at Craigmont. Although Plaintiff was an MI, and Stuart was an

-8-

SAI during that time period, Craigmont lacked an SAI until late November of that semester, during which time Plaintiff alleges that he fulfilled many of the SAI duties. Further, Plaintiff argues that the MIs and SAIs are evaluated under the same criteria and on the same type of form in the JROTC program. Plaintiff further points out that Lt. Col. Stuart was criticized by Winchell for the same difficulties in motivating students and maintaining classroom discipline.

Although Memphis City Schools ultimately terminated Stuart in January 2002 after Winchell recommended the action due to Stuart's "problems maintaining good order and discipline in his classroom at various locations," and his "difficulty relating with his students at the end of his tenure" (J.A. at 39-40), Plaintiff argues that Stuart received repeated opportunities to correct his performance, opportunities which Plaintiff alleges were denied to him. In particular, Plaintiff points to incidents in 1999 while Stuart was an SAI at Hamilton High School. Plaintiff presents evidence that Stuart was reprimanded by the Hamilton principal for ineptness in "receiving and giving orders," and that some correspondence from Stuart during that time frame sounded like a "threat." (J.A. at 108, 110.) Plaintiff also presents evidence that during the 1999 school year Stuart was perceived on a number of occasions as acting insubordinately. Stuart was, in fact, the subject of two "Teacher Incident Reports" involving students and their parents during the 1999 school year. (J.A. at 103-05.) As a result of the incidents and formal investigation process, Stuart was suspended for three days. Plaintiff points out that Hamilton's principal at the time of the incidents in question was African-American, while Plaintiff's principal at the time of his alleged transgressions was Caucasian. *3. Defendant's Arguments Against Finding Plaintiff and Stuart Similarly Situated*

Defendants argue that Stuart was not similarly situated to Plaintiff. First, Stuart was not an MI during the 2000-2001 school year, the year leading up to Plaintiff's termination. Rather, Stuart was an SAI. The MI reports directly to the SAI and the school principal, while an SAI reports directly to the school principal and the DAI (Winchell). The DAI becomes involved with MI supervisory matters only upon request from the SAI and principal. Therefore, Defendants argue, the MI and SAI would not be similarly situated even were they from the same school because their job duties and supervisors would differ. Moreover, in the instant case, Plaintiff and Stuart were located at different schools. Plaintiff's direct supervisors were SAI Olson and principal Sandra Hodge while at Craigmont High School, and SAI Capenter and principal Hooker while at Kingsbury High School. Stuart's direct supervisors for the 2000-2001 school year was the DAI, Winchell, and the principal of Hillcrest High School.

Defendant further argues that the reasons for Plaintiff's termination were not the same as those for Stuart's termination. First, Defendant points out that the 1999 school year incidents which Plaintiff cites as examples of Stuart's more lenient treatment were not during the period in which Winchell was the DAI of the Memphis City Schools JROTC program. Although the Memphis City Schools possessed ultimate hiring and firing authority, the schools did so largely upon recommendation by the JROTC DAI. Winchell became DAI in August 2000. Winchell avers that there were no incidents of insubordination from Stuart during Winchell's tenure as DAI, and that during counseling sessions Stuart evinced a willingness to attempt to improve his instructional approach, a willingness which Winchell avers was not demonstrated by Plaintiff. Nevertheless, after Stuart proved unable to improve his performance in response to several counseling sessions, Winchell recommended that Memphis City Schools terminate his contract, which the schools did

-10-

in January 2002, one semester after Plaintiff was terminated. Therefore, Defendant argues that during Winchell's tenure as DAI, Stuart did not receive more "chances" to improve his performance than did Plaintiff. Finally, Defendant argues that while both Plaintiff and Stuart proved ineffective in the classroom, during Winchell's tenure there were no reports of Stuart's use of inappropriate or demeaning language with his students, and the principal did not directly request Stuart's removal from Hillcrest; this is in contrast to the reports of Plaintiff's use of abusive language with his students during Winchell's tenure, and requests from both the Craigmont and Kingsbury principals for Plaintiff's removal.

*4.* *Analysis*

We find that Plaintiff has failed to show that Stuart was similarly situated to Plaintiff. Even were the Court to accept as true Plaintiffs' allegations that his job duties as an MI and Stuart's job duties as an SAI were substantially the same during the 2000-2001 school year, Plaintiff and Stuart were not similarly situated in all relevant respects. Plaintiff and Stuart had different supervisors, and Stuart's allegedly insubordinate and demeaning behavior took place during a different time frame, in a different school, with a different principal, and under a different DAI.

Plaintiff concentrates on the alleged substantial "due process" received by Stuart in response to student-teacher complaints during the 1999-2000 school year. Yet Plaintiff acknowledges that a school principal acts as a supervisor over MIs and SAIs working in his or her school by rating their performance. Plaintiff further admits that MIs are rated both by the principal at the school and their SAI, while SAIs are rated by their principal and the DAI. Because Plaintiff and Stuart worked at different schools, their direct supervisors were different people. Without sharing the same

supervisor, Plaintiff and Stuart are not "similarly situated" for purposes of a disparate disciplinary treatment claim. *See Mitchell*, 964 F.2d at 583.

Even were this Court to look up the supervisory chain to the DAI, the position filled by Winchell in the instant case beginning in August 2000, Plaintiff and Stuart were not similarly situated as Plaintiff frames his case. During the time period in which Plaintiff alleges that Stuart received more favorable treatment than Plaintiff, the DAI position was filled by Winchell's predecessor, whereas during the time period of Plaintiff's alleged infractions, Winchell filled the DAI position. Therefore even were the DAI position the relevant supervisory position for this Court's similarly situated analysis, Plaintiff's DAI supervisor during his period of allegedly disparate treatment, Winchell, was not Stuart's DAI supervisor during the time period which Plaintiff references to establish that Stuart was similarly situated.

Looking only to the 2000-2001 school year, and taking Winchell as the relevant controlling supervisory authority over both Stuart and Plaintiff during this time frame, we would still be unable to conclude that Plaintiff presents a *prima facie* case of discrimination, because Plaintiff fails to show, as a threshold matter, that Stuart was treated more favorably than Plaintiff during this time frame. Stuart was terminated from his position as SAI after proving unable to improve his classroom performance. Winchell avers that he reached the decision to terminate Stuart after several counseling sessions proved unsuccessful. Plaintiff presents no evidence which calls Winchell's version of events into question. Taking Plaintiff's versions of the facts as true, we find that like Stuart, Plaintiff was terminated from the JROTC program after Plaintiff failed to improve his classroom performance  after several counseling sessions and a change in schools. Plaintiff does not allege events during the 2000-2001 school year which indicate that Stuart was given greater

-12-

opportunity to address his deficiencies than Plaintiff during this time frame. In fact, the only instances of Stuart's poor performance for which Plaintiff offers evidence relate to the 1999-2000 school year, a time frame during which no adverse action was taken against Plaintiff. Therefore, because both Plaintiff and Stuart were terminated from their JROTC instructor positions after several opportunities each to improve their performance during Winchell's tenure as DAI, Plaintiff cannot show that Stuart was treated more favorably than Plaintiff.

Finally, we recognize that this Court has found cases where there is so much evidence of discriminatory animus that a plaintiff's failure to establish the fourth element of the *McDonnell Douglas* burden-shifting paradigm is not fatal to a Title VII claim. *See Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 166 (6th Cir. 2004) (finding *prima facie* burden met, despite failure to fulfill fourth *McDonnell Douglas* factor, when plaintiff alleging gender discrimination presented evidence of animus toward women). To satisfy the *prima facie* burden, the evidence must "tend to eliminate the most common non-discriminatory reasons" for the adverse action and "raise an inference that the adverse action was motivated by discriminatory animus." *Id.* at 166-67. In the instant case, however, Plaintiff offers no evidence which is analogous to the rampant hostility the Court considered in *Birch*. Plaintiff has therefore failed to raise the necessary inference of discrimination.

### III.

### CONCLUSION

Having concluded that Plaintiff fails to present a *prima facie* case of discrimination, we have no need to reach Plaintiff's argument going to the district court's findings on pretext. We therefore **AFFIRM** the district court's grant of summary judgment to Defendant.