Carla **WARFIELD,** Plaintiff–Appellant,

v.

**LEBANON CORRECTIONAL INSTITUTION; Jacqueline Marshall, Defendants–Appellees.**

No. 98–3588.

United States Court of Appeals, Sixth Circuit.

Argued: March 18, 1999.

Decided and Filed: July 1, 1999.

Before: KRUPANSKY, BOGGS, and CLAY, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

Carla Warfield appeals the grant of summary judgment for defendant prison and an individual defendant on her complaint alleging Title VII gender discrimination in employment. Warfield, who was a newly-hired prison guard, was terminated after allegedly failing to perform up to standards during a probationary period of employment. Finding that the grant of summary judgment to defendants was proper, we affirm.

### I

Carla Warfield[1] was hired by the Ohio Department of Rehabilitation and Correction as a corrections officer effective October 31, 1994. She was assigned to work as an officer at defendant-appellee Lebanon Correctional Institution ("Lebanon"). Lebanon houses some of the most dangerous felons in Ohio's prison system.

Upon commencing her employment at Lebanon on October 31, 1994, Warfield was required to serve a probationary period of 180 days pursuant to the provisions of a collective bargaining agreement between the state and the Ohio Civil Service Employees Association. The purpose of the probationary period is to afford the institution the opportunity to observe closely newly-hired employees and to decide whether their performance warrants retaining them beyond their probationary period. Harry Russell, the warden at Lebanon, stated in an affidavit that

> [p]robationary correction officers at the Institution are formally evaluated twice during their probationary period, once at the approximate mid-point of their probationary period and once at the end of that period. In addition, throughout a correction officer's probationary period, he or she is provided with informal

Teresa L. Cunningham (argued and briefed), Florence, Kentucky, for Plaintiff–Appellant.

Robert L. Griffin, Assistant Attorney General (briefed), Anna M. Seidensticker (briefed), Marla K. Bressler (argued), Office of the Attorney General, Employment Law Section, Columbus, Ohio, for Defendants–Appellees.

1. Warfield has recently married; her maiden name was Carla Luncan.

guidance and counseling. Ms. Warfield received both a mid[-]probationary evaluation and a final probationary evaluation.

[Lebanon] generally assigns its probationary employees to a different shift and, as a result, different supervisors, during the first and second halves of their probation. The purpose of this practice is to allow the probationary employees the opportunity to work with different correction officers and different supervisors throughout their probationary period.

During the first half of her probationary period, Warfield was assigned to work the first shift (6 a.m. – 2 p.m.). Lieutenant George Crutchfield was one of Warfield's supervisors on that shift and was responsible for completing Warfield's mid-probationary evaluation. Crutchfield's written evaluation of Warfield was summarized by his comment, "Failure to pass mid-probation due to lack of satisfactory results on evaluation." In his evaluation, Crutchfield rated Warfield as "below expectations" in four evaluation categories and as "meets expectations" in four categories. Crutchfield observed that Warfield, *inter alia:*

- Had "difficulty showing authority with supervising inmates."
- Gave "[i]ncorrect range counts [that] on different occasions ha[ve] caused count to be late." [2]
- "[H]as been observed laughing and talking to inmates for several minutes causing a lack of professionalism."
- "[N]eeds to self-evaluate whether corrections is the proper job career for her and her personality. . . ."

Major Stephen Bowman, who was responsible for reviewing Crutchfield's evaluation, wrote that "Officer [Warfield]'s performance is substandard thus far. Need

to show significant improvement to be retained." Warfield acknowledged that she had provided inaccurate counts and that she needed to improve in her inmate supervision skills. She wrote on the evaluation form, "[A]ppreciate and will improve."

In preparing his evaluation, Crutchfield consulted with other corrections officers. Officer Terry Snelling, who worked in the same cell block with Warfield, told Crutchfield that he did not believe Warfield was a good corrections officer and was a security risk to the institution. Snelling claimed that Warfield had once left her baton-like weapon in her block's unisex bathroom, in violation of prison rules stating that officers should never leave weapons unattended. Officer Gregory Gainey, who also worked in the same cell block with Warfield, told Crutchfield that Warfield was unable to control the inmates for whom she was responsible and was a security risk. He reported that Warfield had once left her cell block unattended and locked non-guard prison personnel in the block with inmates; the personnel had "no way of getting out of the block."

Following her mid-probationary evaluation, Warfield was transferred to the second shift (2 p.m. – 10 p.m.). Lieutenant Jacqueline Marshall,[3] a female, was one of Warfield's supervisors on that shift and was responsible for completing Warfield's final probationary evaluation. In her final evaluation, Marshall rated Warfield as "below expectations" in all eight evaluation categories. In the evaluation, Marshall observed that Warfield, *inter alia:*

- "Does not follow procedures . . [and] needs to be closely monitored."
- "[S]eems unable to grasp the concept of security. . . ."
- "Doesn't understand how to run blocks effectively."

2. Evidently, Warfield conducted inaccurate counts of the inmates in her cell block, which caused the overall prison count to be late and thus mandated that the prison be on emergency "lockdown."

3. Marshall was also named as a defendant in the suit. She was dismissed as a defendant by the district court, a ruling Warfield does not challenge on appeal.

- "[W]alks to Code Ones [prison alerts] instead of responding quickly."
- Was the subject of "constant complaints from staff and inmates."

Submitted along with the evaluation form was a letter by Marshall further evaluating Warfield's performance. According to the letter, Lieutenant Benjamin Dunn, another of Warfield's supervisors, indicated to Marshall that Warfield "needs to think more before she acts." Captain Norman Holloway indicated to Marshall that during one prison alert, Warfield did not respond to the alert properly and had told Holloway that "enough officers were present during the [alert] and that she wouldn't be of any aid to them." Marshall's letter concluded with the observation that Warfield's "obvious lack of interest with her job places her as a liability instead of an asset to this institution."

Marshall later stated in an affidavit that, on numerous occasions, she had to counsel Warfield about permitting too many inmates out of their cells. Warfield had also allowed inmates from other cell blocks into her block (in violation of prison policy); had been observed surrounded by four or more inmates; and had been advised by Marshall about "being too friendly with the inmates and allowing herself to be surrounded by them." Marshall also believed that Warfield did not keep inmates in order during "mass movement."

After Marshall completed Warfield's final evaluation on May 7, 1995, the evaluation was referred to Major Stephen Bowman, who was responsible for reviewing it. Bowman signed the evaluation and noted that Warfield's "performance has been substandard. Recommend not to retain."

He then presented the evaluation to Warden Russell for his review.

Bowman later stated in an affidavit that, although he was not Warfield's supervisor, he had nonetheless "made an effort to observe Ms. Warfield's work performance while she was on duty." Bowman stated that he, like Marshall, had observed Warfield permitting too many inmates out of their cells, not keeping inmates in order during "mass movement," and inappropriately engaging in conversation and laughing with inmates. He also "saw inmates traveling around with Ms. Warfield, which is not appropriate and which indicated to me that Ms. Warfield was either unable or unwilling to control the inmates."

On May 15, 1995, Warden Russell terminated Warfield. Russell later averred that his "decision to terminate Ms. Warfield's employment was based upon her failure to obtain the confidence of her supervisors and her overall unsatisfactory work performance during her probation...."

On March 7, 1996, Warfield filed an Affidavit and Questionnaire with the Equal Employment Opportunity Commission alleging unlawful termination based on race[4] and sex. The Commission issued a dismissal and a right to sue letter on May 21, 1996.

■ On August 16, 1996, Warfield filed suit in district court alleging that she was terminated because of her sex, in violation of Title VII, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1983, and Ohio Rev.Code §§ 4112.02(A) and 4112.99. Discovery commenced. Warfield introduced into evidence disciplinary records of allegedly-similarly-situated male prison guards at Lebanon.[5] Additionally, several affidavits were

---

4. Warfield is white.

5. In this opinion, we have not summarized the extensive evidence in the record on the subject of the disciplinary treatment of allegedly-similarly-situated male employees by the prison, for two reasons. First, this evidence is irrelevant to the disposition of this case, for, as will be explained *infra* in section II.A, pages 10–12, Warfield has not come close to

establishing that she was "qualified" for the position of corrections officer. Second, after undertaking an independent review of the records, pertinent deposition testimony, and other evidence, we conclude that the district court's finding that Warfield "has failed to show that any officer has had the same nature and number of problems as plaintiff" was accurate. It is the discrimination plaintiff's

submitted by both parties and depositions of various witnesses were taken.[6] Crutchfield, testifying about Warfield's performance during the first half of her probationary period, noted that, *inter alia:*

- He did not remember Warfield being late or tardy.
- Warfield dressed properly and had a good working relationship with other co-workers.
- He had gotten complaints from several officers about Warfield.
- He thought Warfield was interested in her job, but "inattentive to duty."
- Warfield understood post orders and security policies.
- That on one particular occasion, Warfield's block was "under control." [7]
- He thought Warfield was "nice," but "wasn't a good correction officer."

Warfield introduced the deposition testimony of two employees at Lebanon, Sergeant Rish and Officer Roebuck, who testified that they had observed Warfield performing satisfactorily and that they did not observe the substandard performance cited by Warfield's evaluators and other coworkers. Although Rish was present in Warfield's cell block several times a week, he was not even employed as a corrections officer, but as a "correctional counselor," taking care of inmate complaints. Roebuck had only worked with Warfield five or six times. Neither Rish or Roebuck had any evaluational responsibility concerning, nor supervisory authority over, Warfield.

Warfield essentially testified that she remembered some of her alleged incidents of substandard performance, but not others. During her testimony, she did not

allege that any incidents of discriminatory conduct by her supervisors or coworkers at Lebanon took place, nor did she assert the existence of any statements or actions that would suggest anti-female bias at the prison.

On September 20, 1996, appellees filed a motion to dismiss. On July 30, 1997, Warfield filed a Motion to Recuse, apparently on the ground that the district judge had invited a motion for sanctions against plaintiff's attorney in a previous, unrelated case. On September 30, 1997, the district court issued an order that denied Warfield's recusal motion.

On October 30, 1997, appellees filed a motion for summary judgment, which was granted by the district court on April 22, 1998. The court ruled, *inter alia,* that (1) Warfield was not "qualified" for the position of corrections officer and thus could not make out a prima facie case of sex discrimination, and (2) the non-discriminatory reasons for her termination proffered by Lebanon were not pretextual. Warfield now appeals.

## II

■ The United States Supreme Court set forth an evidentiary framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for analyzing cases alleging workplace discrimination based on circumstantial evidence. Under the *McDonnell Douglas* burden-shifting principle, a plaintiff bears the burden of establishing by a preponderance of the evidence a prima facie case and creating a presumption of discrimination by demonstrating: (1) membership in the protected class; (2) that she

---

burden to establish that the other employee's acts were of "comparable seriousness" to his or her own infraction. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 n. 5 (6th Cir.1992) (citation omitted). Warfield presented no evidence that remotely establishes that the alleged failings of similarly-situated male employees were of "comparable seriousness" to hers.

6. Many of the statements from these affidavits and depositions have already been noted *supra.*

7. *See* J.A. at 389. Warfield distorts this testimony in her brief, claiming that Crutchfield opined that "Warfield kept her blocks in control." *See* Appellant's Brief at 3.

suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir.1992) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817).

Once the plaintiff establishes a prima facie case, an inference of discrimination arises. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The plaintiff then assumes the final burden of proving that an employer's articulated nondiscriminatory reason for taking an adverse action towards him was unlawfully pretextual. *See Mitchell*, 964 F.2d at 584 n. 6. The plaintiff must prove "that the [employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge." *Burns v. City of Columbus*, 91 F.3d 836, 844 (6th Cir.1996).

### A. Prima facie case

Warfield clearly meets criteria (1) and (2) for establishing a prima facie case of employment discrimination: she is female and was fired. The district court, however, held that she did not raise a genuine issue of material fact that she was "qualified" for the position of corrections officer. Under *McDonnell Douglas*, Warfield has the burden of proving that she was "qualified" for the position. In order to be "qualified" for her position, Warfield must demonstrate that she was meeting her employer's legitimate expectations and was performing to her employer's satisfaction. *See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir.1991); *see also Taylor v. St. Vincent's Medical Center*, No. 97–3236, 1998 WL 211765 at *2 n. 1 & *3 (6th Cir. Apr 22, 1998) (utilizing a "was

meeting the legitimate expectations of h[er] employer" standard and noting that "[t]he court in *Ang* equated 'qualified for the job' with 'meeting the employer's expectations' and 'performing to the employer's satisfaction.' ").

Warfield has not presented evidence sufficient for a jury to reasonably find that she was meeting the legitimate expectations of her employer and, thus, was "qualified" for her job. She does not even argue in her brief that she was qualified for the position of corrections officer (she does not address the issue at all, in fact). She does not, on appeal, seriously dispute the prison's claims that she, *inter alia*, had difficulty supervising inmates, gave inaccurate "range counts," did not respond properly to prison alerts, permitted too many inmates out of their cells, inappropriately engaged in conversation with inmates, and did not properly keep inmates in order during "mass movement."

Instead, plaintiff makes two arguments as to why (apparently despite these problems) she was performing up to her employer's legitimate expectations. First, she argues that Sergeant Rish and Officer Roebuck had observed her performing satisfactorily. However, Rish was employed as a "correctional counselor," taking care of inmate complaints, not as a corrections officer, and Roebuck testified that he did not work with Warfield on a regular basis. Moreover, courts have held that the mere submission of materials from a co-worker or supervisor indicating that an employee's performance is satisfactory does not create a material issue of fact. *See, e.g., Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir.1994); *see also Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) ("the judgments of some who thought [a plaintiff's] work was good" not enough to raise material issue of fact as to whether plaintiff had "met his employer's legitimate expectations"). This is especially true here, where neither witness was in

a position to evaluate all, or even most, of her work.

■ Warfield next contends that similarly-situated male employees were not terminated for doing some of the same improper acts committed by her and, thus, she was "qualified" for the position. This is irrelevant. The "prima facie case" exists to determine whether a plaintiff is entitled to the inference that discrimination occurred. One of the requirements for being able to take advantage of this inference is that the plaintiff must show that he or she was "qualified." Whether or not *others* were qualified is usually not generally relevant to the question of whether the *plaintiff* was qualified.[8] Such evidence may be of importance for demonstrating that a plaintiff was "was treated differently from similarly situated members of the unprotected class" (criterion (4) of the prima facie test), or that an employer's proffered nondiscriminatory reasons for the plaintiff's termination were pretextual.

■ Warfield is basically arguing that the *McDonnell Douglas* test's third and fourth criteria are the same: that, if she was treated differently than similarly-situated employees, she was somehow *de facto* qualified for her job. This is simply wrong. Warfield cannot meet her burden of showing that she met her employer's legitimate expectations simply by claiming that others may have not met some of those expectations as well. Therefore, we find that Warfield has not presented evidence sufficient for a jury to reasonably find that she was meeting the legitimate expectations of her employer and, therefore, she has not made out a prima facie case of sex discrimination.

**8.** We note that evidence of the treatment of other employees might, in rare cases, shed some light on the issue of what the employer's expectations *actually are*. For example, if an employer alleges that he expects his employees to be able to perform function A, but a plaintiff was terminated solely for failing to

## B. Pretext

■ Even assuming *arguendo* that Warfield could make out a prima facie case of discrimination, she has not presented evidence sufficient for a jury to reasonably find that Lebanon's numerous asserted reasons for her termination were pretextual. A plaintiff must do more than simply impugn the legitimacy of the asserted justification for her termination; in addition, the plaintiff "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1083 (6th Cir.1994).

■ The only evidence that Warfield brings forth in her effort to show pretext arguably establishes only that other male probationary corrections officers at Lebanon were not terminated for committing *some* of the acts she had committed. In essence, Warfield contends that a hypothetical Title VII plaintiff, terminated for committing acts A, B, C, D, and E, can use as her *sole evidence* of pretext the fact that a co-worker outside the protected class was not terminated for committing act B, and another co-worker outside the class was not terminated for committing act E.

This is simply wrong. It is the discrimination plaintiff's burden to establish that the other employee's acts were of "comparable seriousness" to his or her own infraction. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 n. 5 (6th Cir.1992) (citation omitted). In the hypothetical above, for example, the plaintiff would have to at least establish that a similarly-situated male employee who committed acts A, B, C, D, and E (or, perhaps, acts "comparably serious" to acts A, B, C, D, and E) was not terminated. Here, Warfield has presented no evidence that even remotely establishes

perform function A despite the fact many other retained employees also could not perform function A, the plaintiff could perhaps make the argument the ability to perform function A is not "really" an expectation of the employer. That, however, is not this case.

that her alleged failings were of "comparable seriousness" to those of similarly-situated male employees. Since this was plaintiff's only evidence of pretext, a jury could not reasonably find that Lebanon's numerous asserted reasons for her termination were pretextual and, therefore, summary judgment was proper.

## C. Recusal

■ Finally, Warfield contends that the district court judge should have recused herself on the ground that the judge allegedly was biased towards her counsel in a previous, unrelated case because the judge accused counsel of making misrepresentations to the court in that case. This claim is meritless, in light of the recent Supreme Court opinion in *Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). There, the Court stated that

> opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.... Not establishing bias or partiality ... are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* at 555–56, 114 S.Ct. 1147.

Warfield claims that the judge continued to be biased against her counsel in this case. For example, she claims that the judge accused her of again making misrepresentations to the court. One of these alleged misrepresentations was a claim in Warfield's brief that Crutchfield had testified that Warfield kept her cell blocks under control. However, the judge was correct in describing this statement, for it appears to have been a misrepresentation, one that Warfield has repeated to this court.[9]

There is simply no evidence in the record that in any way tends to establish that the district judge was biased against Warfield's trial counsel and, thus, her argument is without merit. Moreover, her argument cannot be correct, for otherwise a lawyer could be assured of not having to face a particular judge in a later case by engaging in, and being caught at, conduct in an earlier case that would elicit a hostile response. As the Supreme Court implied in *Liteky*, in the ordinary course, federal judges can properly weigh the merits of the claims made by a party's lawyer, even if previous claims made by the same lawyer have lacked merit.

### III

The district court's grant of summary judgment is AFFIRMED.

---

9. *See supra* note 7, and accompanying text at   page 8.