**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0863n.06
Filed: December 18, 2007

**No. 07-5181**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KAREN J. MYERS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| UNITED STATES CELLULAR | ) | EASTERN DISTRICT OF TENNESSEE |
| CORPORATION, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE: BOGGS, Chief Judge; McKeague, Circuit Judge; and COHN, District Judge.**[*]

**AVERN COHN, District Judge**. This is a sex discrimination case under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. Plaintiff-Appellant Karen Myers ("Myers") appeals from the dismissal of her complaint against Defendant-Appellee United States Cellular Corporation ("USCC"). Myers claims that USCC discriminated against her on the basis of her sex by terminating her and failing to transfer/demote her in lieu of termination. The district court granted USCC's motion for summary judgment on the grounds that Myers failed to make out a prima facie case of sex discrimination on either basis and that even if such a showing had been made, she failed to establish pretext. For the reasons that follow, we **AFFIRM** the decision of the district court.

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I. BACKGROUND

Myers began working for USCC in 1994 as a Data Service Engineer. USCC, which has many locations across the country, is in the business of selling cellular phones and monthly cellular service. Myers worked at a USCC store located in Knoxville, Tennessee where she held several positions over the years. In 1997, Myers received ratings of "Meets Expectations" or "Exceeds Expectations" in every category of her employee evaluation. In 1998, she received "Exceeds Expectations" ratings in every category with an overall rating of "ER," indicating that she exceeded job requirements on a consistent basis. The following year she received an "ER+" rating. During Myers's annual performance review for 2002, she received positive performance evaluations, including the highest rating, an "FE" or "Far Exceeds" rating. These ratings were given by Hichem Garnaoui ("Garnaoui"),[1] Myers's ultimate supervisor. In 2002, Garnaoui gave out only two "FE" ratings, to Myers and another female employee, Marianne Infantino.

In May 2003, Myers's direct supervisor, Kent Lee ("Lee") and Lee's supervisor, Garnaoui, jointly promoted Myers to the position of Supervisor 1x Data Enhanced Services. In July 2003, Garnaoui asked Myers to assume the position of Manager of Data Services on an interim basis while the present manager, a male, was on leave. In so doing, Garnaoui chose

---

[1]Under an Agreed Protective Order, "any personnel information or documents relating to Defendants' current or former employees who are not parties to this litigation" was deemed confidential and filed under seal. As a result, portions of Myers's response to USCC's motion for summary judgment, including exhibits, were filed under seal. This resulted in the parties and the district court identifying certain USCC employees using the following designation: "Employee No. __." For example, Garnaoui is identified as "Employee No. 1." Brian Beeler, Myers's co-worker with whom she did not get along, is identified as "Employee No. 2." Portions of Myers's brief on appeal and the joint appendix (Volume IV) have also been filed under seal. For clarity, we have referred to Garnaoui and Beeler by name.

Myers over another male supervisor. On December 16, 2003, Garnaoui officially promoted Myers to Manager of Data Services. Myers was responsible for planning, organizing, and managing Data Services personnel, a staff of 24 people.

As Manager of Data Services, Myers reported to Lee, who in turn reported to Garnaoui. In September 2004, Lee left the company, after which Garnaoui decided to restructure his team, including the Data Services Department. At that time, Myers began reporting directly to Garnaoui. She continued to do so until November 2004, when William Heilenbach ("Heilenbach") became the Director of the Network Operations Center. Heilenbach reported to Mike Irizarry ("Irizarry"), the Executive Vice President of Engineering and Chief Technical Officer. Although the hierarchy is unclear, Garnaoui still had authority over Myers.

Several months after being promoted, in September 2004, Garnaoui met with Myers to discuss concerns about Myers's ability to be an effective leader. He specifically counseled Myers to confront Brian Beeler ("Beeler"), an employee with whom Myers did not get along. Apparently, Myers led Beeler to believe that his performance was satisfactory; however, Myers told her supervisors that it was not. During the meeting, Myers was introduced to Senior Associate Relations Manager, Roberta Frank-Bohm, to help guide Myers in the areas where she was lacking and help her to communicate better with her team.

That same day, Garnaoui met with Beeler individually and together with Myers. Garnaoui addressed "team work" and "supporting one another" with both of them. Garnaoui also told Myers to make an assessment of her team and the positions they currently held in light of the

3

reorganization. Garnaoui informed both Myers and Beeler that their positions would be changed during reorganization and that they would both be placed on a Performance Improvement Plan ("PIP"). After the meeting concluded, Garnaoui privately told Myers that he would help and support her and that "he wanted her to be successful." Myers also testified at deposition that after the meeting, she knew that Garnaoui was not happy with her performance or Beeler's performance.

Myers's PIP indicated deficiencies in the areas of "Coaching, Communication, Team Effectiveness, Business Process Improvement, and Leadership." These deficiencies related to her issues with Beeler. According to Myers, Garnaoui gave her positive feedback but mentioned that she needed improvement in giving her employees honest feedback regarding their performance. The PIP noted that this resulted in mis-communication as well as damage to "trusting and respectful relationships" because "[l]eadership loses credibility and the team feels resentful." Garnaoui explained to Myers that she was responsible for initiating appropriate action, including termination, if she believed an employee under her supervision had performance issues.

After being placed on the PIP, Myers asked Garnaoui for a "less[er] position," effectively a demotion. Beeler also asked to return to his prior position, which too constituted a demotion. Garnaoui apparently agreed to both requests but emphasized that they would both have to work as a team until the completion of the reorganization.

Despite the PIP, the problems between Beeler and Myers continued. Garnaoui also

4

learned that Myers was "bad-mouthing" leadership and undermining management, including him. Myers's criticism of Garnaoui stems from a September 2004 management meeting in Galena, Illinois, where Garnaoui apparently referred to his supervisor, Irizarry, as "crazy" or "bad grandmother" and "the white elephant in the room." Myers attended the meeting and heard the comments. A few months later, in December 2004, Myers told Irizarry about Garnaoui's remarks about him during a car ride to an airport. After this conversation, Irizarry contacted Tom Lovett ("Lovett"), Manager of Surveillance for USCC, about what Garnaoui was alleged to have said about him at the Galena meeting. Lovett, although reluctant, confirmed that Garnaoui had made derogatory comments about Irizarry.

During this same time, Heilenbach received complaints from Myers about Garnaoui's management style. Heilenbach also received complaints from Myers's subordinates about her leadership.

As a result, Heilenbach held meetings with Myers in December 2004 and January 2005 to discuss how she could better run her group. They discussed the environment she had created through her on-going problems with Beeler as well as gossiping issues. Heilenbach gave Myers the same instructions that Garnaoui had previously given her, which were to discharge Beeler if she felt that he was undermining her.

In early January 2005, Irizarry says he confronted Garnaoui about the derogatory comments at the Galena meeting. Garnaoui, however, denies any such confrontation took place.

In the middle of January, Garnaoui told Heilenbach that he decided to terminate Myers

5

and Beeler for their "continued sniping" at one another. Garnaoui also discussed terminating Myers and Beeler with the Director of Human Resources for the East Region, Janet Jungclaus ("Jungclaus") and Associate Relations Manager, Lawrence Brewer. Both confirmed that no training could remedy the behavioral issues previously identified for Myers. However, according to Myers, Jungclaus stated that she believed that Myers was not given the coaching and guidance that was needed and that Myers was not treated properly. Myers and Beeler were both terminated on January 31, 2005. Garnaoui made the termination decision.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This court reviews a district court's order granting summary judgment *de novo*. *Leary v. Daeschener*, 349 F.3d 888, 896 (6th Cir. 2003). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### B. TITLE VII

Under Title VII, an employer cannot "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Because Myers has no direct evidence of sex discrimination, Myers is required to

6

follow the *McDonnell Douglas/Burdine* burden-shifting framework. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992). Under this test, Myers must first make out a prima facie case by producing evidence that (1) she is a member of a protected class; (2) she suffered a materially adverse employment action; (3) at the time of the adverse action, she was otherwise qualified for her position; and (4) she was replaced and/or treated less favorably than similarly situated male employees. *Mitchell*, 964 F.2d at 582-83.

Once Myers establishes a prima facie case, the burden of production shifts to USCC to "articulate some legitimate, nondiscriminatory reason" for terminating the plaintiff. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-56 (1981) (internal quotation makes omitted). And if USCC can offer at least one such reason, the burden of production shifts back to Myers to show that each proffered reason is merely a pretext for illegal discrimination. *Id*. at 253. Because a jury cannot reject an employer's proffered rationale "unless there is a sufficient basis in the evidence for doing so," *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), Myers must demonstrate "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate . . . discharge, or (3) that they were insufficient to motivate discharge." *Id*. at 1084 (internal quotation marks and emphases omitted).

### 1.  Whether Myers Was Qualified For Her Position

USCC argues that Myers failed to establish a prima facie case of sex discrimination because she failed to show that she was qualified for her position at the time she was terminated. USCC says that the record shows Myers was not meeting performance standards in the management position and was therefore unqualified. The district court, relying on this Court's

decision in *Wexler v. White's Fine Furniture, Inc*. 317 F.3d 564 (6th Cir. 2003) (*en banc*),

concluded otherwise, reasoning that Myers's "excellent performance history and prior experience

demonstrate that she had sufficient objective criteria to consider her qualified for the

management position." J.A. at 616.

In *Wexler*, the *en banc* court explained:

> At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job. The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are a least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

*Id*. at 575-76 (emphasis and internal citations omitted). We agree with the district court that

under *Wexler*, Myers was qualified for the job. She held several different positions over the years

and had a history of receiving high ratings in every category of the performance evaluations. Her

performance coupled with her experience objectively qualified her for the management position.

Thus, Myers has met the qualification prong of the prima facie test.

**2. Whether Myers Established a Prima Facie Case Based on Her Termination**
**a. Whether Myers Was Replaced By A Male Employee**

The district court determined that Myers was not "replaced" by a male employee. We

agree. This Circuit has held that "a person is not replaced when another employee is assigned to

perform the plaintiff's duties in addition to other duties, or when the work is redistributed among

8

other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (internal quotation marks omitted).

Here, shortly after Myers's termination, her responsibilities were split among three current employees after the reorganization.  "Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilly v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992).  Although USCC eventually hired a male, Kurt Johnson ("Johnson"), into a new senior management position which assumed the responsibilities Myers had, the record is unclear as to when Johnson was hired.  Moreover, the position Johnson assumed was a new senior management position that Myers admits differed from the position she held.  As such, Myers has not established that she was replaced by a male employee.

### b.  Whether A Similarly Situated Male Employee Was Treated More Favorably

After determining that Myers was not replaced by a male employee, the district court considered whether a similarly situated male employee was treated more favorably than Myers. The district court concluded that Myers had not made such a showing.

In order for two or more employees to be similarly situated, Myers has the burden of proving that she is similarly situated to them "in all respects." *Mitchell,* 964 F.2d at 583.  Also, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*

9

Myers says that she is similarly situated to Garnaoui and Lovett because both were males who "bad-mouthed" leadership but were not fired. The record shows otherwise. As to Garnaoui, he did not hold the same title, or even the same level position, as Myers. Garnaoui was two levels above Myers and had the authority to discipline and terminate Myers. Moreover, the record does not show that Garnaoui had the same performance issues as Myers in dealing with subordinates nor was he placed on a PIP. Myers is therefore not similarly situated to Garnaoui. The district court was correct in so finding.

As to Lovett, at the time Irizarry questioned him about the derogatory comments made by Garnaoui, Lovett was a Regional Switch Manager. He no longer reported to Garnaoui or to Irizarry. There is also no evidence that Lovett's position was similar to Myers or that he was on a PIP for performance issues. Although Myers and Lovett were both at the same party where they heard Garnaoui's derogatory comments about Irizarry, their situations are distinguishable because Myers willingly told Irizarry about the comments whereas Lovett answered Irizarry's questions regarding the situation. Lovett, unlike Myers, requested specific assurances that he would not be subject to any adverse action by answering the questions.

Because neither Lovett nor Garnaoui were similarly situated to Myers, she has failed to make out a prima facie case of sex discrimination arising from her termination.

### 3. Whether Myers Established a Prima Facie Case Based on a Failure to Demote

Myers also claims that USCC discriminated against her because she should have been allowed to accept a demotion by transferring to another position instead of being terminated. In order to establish a prima facie case of sex discrimination based on a failure to transfer/demote,

10

Myers must show that: (1) she was a member of a protected class; (2) at the time of her termination she was qualified for other available positions within the corporation; (3) the employer did not offer such positions to her; and (4) a similarly situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position, or other direct or circumstantial evidence supporting an inference of discrimination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351 (6th Cir. 1998).

The district court rejected such a claim, explaining:

> Plaintiff has presented no evidence of an available position for which she was qualified at the time of her termination. While plaintiff contends that a position existed because she was supposed to be part of the reorganization, she has not identified what specific position was available but denied to her. In addition, plaintiff has not shown that similarly situated male employees were given the opportunity to transfer to an available position while she was not. Although plaintiff has named several employees who were allowed to transfer to lesser positions, there is no showing that these male employees were similarly situated to her in all relevant aspects or that they were given the opportunity to transfer in lieu of termination. There is no evidence that these employees had comparable positions to plaintiff, that they had the same performance issues, that they were subject to a PIP, or that they were known to have "badmouthed" or criticized company leaders. Further, Employee No. 1 testified that he had terminated for performance issues three other male employees besides Employee No. 2 without offering a demotion as an alternative.

J.A. at 621. We agree. Myers has not identified what "lower level" position was available for which she was qualified. Her reference to a possible position after the company's reorganization in "application development . . . . [d]oing WAN performance statistics" is not sufficient. Moreover, the record clearly shows that Beeler, a male, was treated the same way—he was terminated and not given the opportunity to transfer to a lower position. Myers, however, says that several other employees, identified as Employee No. 3, Employee No. 4, Employee No. 5,

11

Employee No. 6 and Employee No. 7, were all permitted to be demoted after having "performance difficulties." Myers's identification of these employees falls short because she does not provide any evidence as to the circumstances of their demotions or that they are otherwise similarly situated to her. Under these circumstances, Myers has failed to make out a prima facie case of sex discrimination based on a failure to transfer/demote.

### 4. Whether Myers Established Pretext

Myers also challenges the district court's finding that she failed to establish pretext. A plaintiff meets her burden to show pretext by producing "sufficient evidence from which the jury may reasonably reject the employer's explanation." *Warfield v. Lebanon Corr. Inst*., 181 F.3d 723, 730 (6th Cir. 1999) (quoting *Manzer*, 29 F.3d at 1083)). With regard to pretext, this Circuit has stated:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.

*Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 883 (6th Cir. 1996) (citations omitted). "To prove pretext, the plaintiff must introduce admissible evidence to show 'that the proffered reason was not the true reason for the employment decision' and that [discriminatory] animus was the true motivation driving the employer's determination." *Barnes v. United Parcel Serv*., 366 F. Supp. 2d 612, 616 (W.D. Tenn. 2005) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993)).

12

Myers's main argument to establish pretext is that USCC's reasons for her termination have changed over time. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) (internal quotation marks omitted). In *Cicero*, the defendant stated in answers to interrogatories that plaintiff was fired for poor performance. A different reason was given at a deposition. Yet another reason was given at the summary judgment stage. Under these circumstances, the panel in *Cicero* concluded that "[w]hen the justification for an adverse employment action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendant's decision." *Id*.

As noted above, Garnaoui explained to Myers that she was being terminated for "bad-mouthing" leadership as well as her inability to effectively deal with her subordinates. In USCC's position statement that was submitted to the Tennessee Human Rights Commission, it stated:

> [B]oth Ms. Myers and [Beeler] continued to demean and criticize one another behind their backs. [Garnaoui] also discovered that Ms. Myers still was not fulfilling her leadership duties and that she also was "bad mouthing" and undermining management, and especially [Garnaoui] himself.

In its brief in support of summary judgment and on appeal, USCC articulates the same reason for Myers's termination:

> Unfortunately, both Myers and [Beeler] continued to demean and criticize one another. [Garnaoui] also discovered that Myers was still not fulfilling her leadership duties and that she also was "bad mouthing" and undermining management, including [Garnaoui].

J.A. at 23.

13

In her response to USCC's motion for summary judgment, Myers described the deposition testimony of several USCC employees which confirms these reasons for her termination. For instance, Myers says that Heilenbach testified that Garnaoui told him he was terminating Myers for "continued sniping." J.A. at 196. She also says that Jungclaus "recalled generally that [Garnaoui] told her it had to do with the behavior problems prior to the termination" *Id*. Myers further says that Lawrence Brewer, an employee in the Human Relations Department, "recalled [Garnaoui's] exact explanation to him being that Beeler and Myers were 'undermining' leadership." *Id*. Myers's own description of this deposition testimony shows that Garnaoui gave the various human resource professionals very similar reasons for his decision to terminate Myers. Unlike in *Cicero*, the reasons for Myers's termination did not change.

Myers, however, says that there was a shift in the reason given for her termination based on testimony from Irizarry where he says that Garnaoui told Irizarry the termination was based on performance-related issues. The district court concluded that whether or not Garnaoui told Irizarry that the termination was related to performance does not show or infer that Garnaoui's motivation was based on sex discrimination. We agree. As the district court explained:

> Whether Employee No. 1 told Irizarry that plaintiff's termination was for nonperformance does not place the truthfulness of the reasons articulated by defendant in doubt. Plaintiff has admitted that she criticized Employee No. 1 and that she told Irizarry about the derogatory comments. Her conduct was sufficient to warrant dismissal. Whether or not Employee No. 1 told Irizarry the termination was related to performance does not show or infer that sex discrimination was the real motive. Certainly, there is ample documentation in the record from plaintiff's PIP to justify dismissal for performance related issues. Stating that plaintiff's termination was performance related does not amount to shifting justifications as described in Cicero. It is at most a collateral reason for the termination, but it does not diminish the sufficiency of the reasons given for defendant's employment action.

14

J.A. at 625-26.

Put simply, USCC has not changed its position that Myers was terminated for "bad-mouthing" leadership, breaking trust with Garnaoui, and for her behavioral issues with Beeler. USCC has not materially shifted its justifications. Because Myers is unable to establish pretext, the district court properly granted summary judgment on this ground.

### 5. Whether Myers's Assertion of Improper Training is Evidence of Sex Discrimination

In her complaint, Myers made allegations of discrimination based on interim pay, vacation time, and training. At the summary judgment stage, Myers explained that such allegations were relevant background evidence to support her claims of sex discrimination. On appeal, Myers argues that Garnaoui's failure to properly train her evidences an intent to discriminate; she does not mention interim pay or vacation time issues. Apparently, Garnaoui put together a leadership plan for another employee, Andrew Spence and noted that USCC needed to help newly promoted leaders to be successful. The district court rejected the notion that this fact showed an inference of sex discrimination because there was no indication as to whether Spence was similarly situated. We agree. More importantly, the fact that USCC might have needed a development plan to train its employees for leadership positions, "does not set a background of sex discrimination nor raise a material issue of fact concerning the reasons for plaintiff's termination." J.A. at 628.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the decision of the district court.

15