<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 18a0411n.06

Case No. 18-3059

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 15, 2018
DEBORAH S. HUNT, Clerk

SHANNON R. MOST,                                )
                                                )
    Plaintiff-Appellant,                        )
                                                )
                                  )    ON APPEAL FROM THE UNITED
v.                                              )    STATES DISTRICT COURT FOR
                                                )    THE NORTHERN DISTRICT OF
BWXT NUCLEAR OPERATIONS GROUP,                  )    OHIO
INC.,                                           )
                                                )
    Defendant-Appellee.                         )


       BEFORE: WHITE, DONALD, and LARSEN, Circuit Judges.

       **BERNICE BOUIE DONALD, Circuit Judge**. Plaintiff-Appellant Shannon Most alleges that he was terminated from his job with Defendant BWXT Nuclear Operations, Group, Inc. ("BWXT"), in violation of Ohio anti-discrimination laws. He argues that he was discriminated against for his social anxiety disorder, and that BWXT retaliated against him, and failed to accommodate him. The district court granted summary judgment to BWXT on all claims. For the reasons below, we AFFIRM.

I.

Most has social anxiety disorder, for which he takes medication and receives counseling. His disorder prevents him from speaking in front of groups larger than four persons, and such activity can lead to panic attacks or fainting.

BWXT is a government contractor that manufactures nuclear reactor components for the United States Navy. On March 31, 2016, BWXT hired Most to work as a Senior Numerical Control Programmer ("NC Programmer") at its Euclid, Ohio facility, and he began work on April 4, 2016. Most's job was to develop NC codes and programs to control complex manufacturing tools. The job required proficiency in 3-D modeling software, among other things. NC Programmers only generate revenue for BWXT when they perform billable design work on client projects.

Most did not disclose his social anxiety disorder during the application process. He believed, based on the online job description, that the NC Programmer position would not trigger his disorder.

Most began working for BWXT at the same time as Michael Paulocsak, who was hired to the same position. Both began the same training, which typically takes about three weeks to complete, and both were trained by Todd Henry, BWXT's most senior NC Programmer. After completing training, NC Programmers can begin performing billable work. Within Most's first two weeks at the company, Henry reported to Most's supervisor, John Yahnert, that both men were initially progressing slowly. But Paulocsak's skills began to improve after two weeks; Most's skills did not. Most was the only NC Programmer in the past eight years who failed to complete training within approximately four weeks. Most claimed that though they had the same

orientation, Paulocsak benefited from access to immediate help from another programmer,[1] as well as a personal copy of a work program that he worked on at home. Around April 27, Henry told Yahnert that Most still was not progressing quickly enough and that he was not performing billable work.

On April 28, 2016, Yahnert told Most he was not adequately progressing through training. A few days later, on May 3, 2016, Most emailed Yahnert and advised that he was going to use his three personal days to catch up on online training and reevaluate whether he was suitable for the position. On May 8, 2016, Most emailed Yahnert again and said that he had spoken to the Ohio Unemployment Agency as well as others with backgrounds in human resources, and he wished to inform BWXT that he has a disability—social anxiety disorder—protected by the Americans with Disabilities Act ("ADA"). Most also stated that he had recently become aware of several job requirements not listed in the original online job description that he would be unable to perform and that he needed accommodation.

Shortly after Most's self-identification as having social anxiety disorder, he met with Yahnert and they discussed when an NC Programmer was required to interact with others and with groups. Yahnert explained that the NC Programmer may facilitate a conversation or respond to comments or questions but need interact with groups only in the event of a machining equipment breakdown. Yahnert further clarified that he would not require Most to participate in some activities that Most had identified as concerns. During this meeting, Yahnert told Most that "we all have stress in our jobs." Most later testified that Yahnert's meeting notes summarizing their conversation were accurate.

---

[1] Most testified at deposition that Paulocsak sat next to Jeremy Aprile's work cubicle and "those two worked together on a lot of things." R. 13-1 at PageID #140. When asked, "Is there any reason why you could not have asked Jeremy for help if you needed it?" Most replied, "It was inconvenient. I did when I could, but you would have to walk all the way across the office to his cubicle. It was inconvenient." *Id.* at #141-42.

Around the second or third week of May, Most asked Human Resources Manager Robert Joyce for his business card while someone else was present in Joyce's office. Joyce slammed the door shut but apologized the next day. At some point after that, Joyce told Most "[t]ell [your lawyer] hi for me." In the next meeting Most had with Joyce, Joyce asked "so did you talk to your legal counsel, or did you give [him my] card?" Most continued to speak with BWXT representatives about his request by email and in person over the next few weeks. In one email, he specified tasks for which he believed he would need accommodation.

On May 24, 2016, Yahnert again spoke with Most about the lack of improvement in his performance. After over six weeks of training, Most still had not begun performing billable work. Paulocsak, on the other hand, had begun performing billable work within his first three weeks of employment.

On the morning of May 25, 2016, BWXT requested that Most provide medical documentation of his social anxiety disorder diagnosis by the morning of May 31, 2016. On May 31, 2016, Most informed BWXT that the clinic which had originally diagnosed him had apparently closed and, as a result, he would be unable to provide timely documentation. Most advised that he had booked an appointment with his current doctor to receive an updated diagnosis. He also provided two years of prescription records from his pharmacy, which demonstrated his use of medication prescribed for social anxiety.

On June 6, 2016, BWXT terminated Most's employment. Most claimed that he attempted to provide medical documentation of his social anxiety disorder as well as prescription records on the day of his termination, but that BWXT refused to accept them and proceeded with his dismissal. According to his termination letter, Most was fired because: 1) he failed to meet performance expectations after nine weeks on the job; 2) his requested accommodation was not feasible given

the sensitive nature of the work and need to communicate with the entire workforce when equipment is shut down; and 3) he failed to provide the requested documentation of his diagnosis.

Most brought suit in Ohio state court for claims including disability discrimination, retaliation, and failure to accommodate, in violation of the Ohio Civil Rights Act, Ohio Rev. Code § 4112.02. BWXT removed the action to federal court pursuant to 28 U.S.C. §§ 1441 and 1446. The district court granted BWXT's motion for summary judgment, and Most now appeals. We review de novo the grant of summary judgment. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).

II.

Most first appeals the district court's finding that he failed to provide evidence sufficient to make a prima facie case for disability discrimination. "To the extent Ohio's disability discrimination law and the federal disability discrimination law coincide, Ohio courts can use federal case law for guidance." *Matasy v. Youngstown Ohio Hosp. Co., LLC*, 95 N.E.3d 744, 751 (Ohio Ct. App. 2017) (citing *Columbus Civ. Serv. Comm'n v. McGlone*, 697 N.E.2d 204 (Ohio 1998)). Ohio Revised Code § 4112.02 provides, "It shall be an unlawful discriminatory practice: (A) For any employer, because of the . . . disability . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to . . . any matter directly or indirectly related to employment." Similarly, the ADA states it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "The definition of discriminate includes the failure to provide reasonable accommodation to an otherwise qualified individual with a disability, unless doing so would impose an undue hardship on the employer's business. 42 U.S.C. § 12112(b)(5)." *Matasy*, 95 N.E.3d at 750–51. Ohio Administrative Code 4112–5–02(K) provides that a "qualified disabled person" means "a disabled

person who can safely and substantially perform the essential functions of the job in question, with or without reasonable accommodation . . . ." To make a prima facie case of disability discrimination, a plaintiff must show "(1) that he or she was handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question." *Columbus Civ. Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206 (Ohio 1998). If a plaintiff can make a prima facie case, the burden shifts to the employer to state a nondiscriminatory reason for the action in question. *Proctor v. Ohio Civ. Rights Comm'n*, 863 N.E.2d 1069, 1073 (Ohio Ct. App. 2006). If the employer does so, the burden then shifts back to the plaintiff to demonstrate that the nondiscriminatory reason was mere pretext. *Id.*

The district court concluded that Most's claims for disability discrimination failed because he did not show that he could perform the essential functions of an NC Programmer, regardless of his requested accommodation. Most argues that because he was early in his employment, he only needed to satisfy the prerequisites for the position—which he argues that he did—and establish that he could perform the essential functions with or without reasonable accommodation.

In support of his first point, Most argues that he met BWXT's qualifications for the NC Programmer position—which required four years of experience or an associate degree in the relevant field and 3D modeling experience, among other qualifications. He argues that he exceeded these qualifications and possessed extensive experience with the equipment, as well as proficiency with the relevant programs and fourteen years' experience in similar positions. Most points out that he was actually hired for a higher position than that for which he applied, and his supervisors had no concerns about his abilities before he began working at BWXT.

Most argues that courts in this circuit "generally look to on-the-job performance issues only when the plaintiff has been employed for an extended period of time." In support, he cites *Oliver v. St. Luke's Dialysis, LLC*, 491 F. App'x 586 (6th Cir. 2012), a race, gender and age discrimination case brought under the Ohio Civil Rights Act and the Age Discrimination in Employment Act ("ADEA"), and *Fortunato v. University Hospitals Physician Services, Inc.*, No. 1:15 CV 1940, 2016 WL 6070111 (N.D. Ohio, Oct. 17, 2016), an age and disability discrimination case brought under Ohio law, the ADEA, and the ADA. Though both cases involve plaintiffs who had worked for the respective defendant employers for at least a few years, neither court had occasion to address whether long-term employment was necessary for an employer to demonstrate that the employee was not qualified or able to perform the job. Rather, *Fortunato* acknowledged that a plaintiff who already holds a position—as Most did—must demonstrate that he or she "was meeting [his or her] employer's legitimate expectations and was performing to [his or her] employer's satisfaction." *Fortunato*, 2016 WL 6070111, at *7 (quoting *Oliver*, 491 F. App'x at 588). *Oliver* cited *Warfield v. Lebanon Correctional Institute*, 181 F.3d 723 (6th Cir. 1999), a Title VII gender discrimination case, in which we observed that in order to be qualified for her position, a plaintiff "must demonstrate that she was meeting her employer's legitimate expectations and was performing to her employer's satisfaction." *Id.* at 729. We found that the plaintiff failed to present evidence sufficient for a jury to reasonably find that she was meeting the legitimate expectations of her employer, noting that the plaintiff did not argue she was qualified for her corrections officer position and that she did not seriously dispute her employer's claims that she failed to properly do her job. *Id.*

So too here. Most only argues that he was qualified on paper, which, if anything, demonstrates why he was hired for the position, rather than how his performance was to BWXT's

satisfaction. He makes no argument as to how he was performing to BWXT's expectations. Most cites *Gunthorpe v. DaimlerChryster Corp.*, 90 F. App'x 877 (6th Cir. 2004), to support his argument that the court should only review his objective qualifications to determine if he was meeting BWXT's expectations. But like *Oliver* and *Fortunato*, *Gunthorpe* clarified that to be considered qualified, "an employee must demonstrate that he or she was meeting the employer's legitimate expectations and was performing to the employer's satisfaction." *Id.* at 880 (internal citation omitted). In addition, the facts in *Gunthorpe* differ from the facts here in key ways. The plaintiff in *Gunthorpe* provided evidence that he had outperformed the person chosen to replace him, which we held was sufficient evidence that he was otherwise qualified to do his job. *Id.* We also took into account that the plaintiff's positive performance records contradicted the defendant employer's subjective evaluations of the plaintiff's performance. *Id.* In contrast, Most puts forth no evidence of positive performance that conflicts with BWXT's negative evaluations of his performance. He also does not submit evidence that he was qualified to do the job, other than his on-paper qualifications. Rather, Most's deficient performance supports that he was unqualified to do the job. Most's claim for disability discrimination thus fails as a matter of law.

### III.

Most also claims that the district court erred in dismissing his retaliation claim. A plaintiff claiming retaliation must show that 1) he or she engaged in a protected activity; 2) he or she was subject to an adverse employment action; and 3) a causal link exists between the protected action and the employer's adverse action. *Proctor*, 863 N.E.2d at 1073. The above-discussed burden shifting framework also applies here. *Id.*

Even assuming *arguendo* that Most has made a prima facie case for retaliation, he fails to establish pretext. Most "can show pretext in three interrelated ways: (1) that the proffered reasons

had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016). Most does not specifically identify which way he seeks to demonstrate pretext, but his primary argument that he did not have "'well-documented' performance issues," implicates all three ways of showing pretext.

Regarding Most's performance issues, Yahnert's uncontroverted declaration states that Henry informed Yahnert within the first two weeks of training that Most and Paulocsak were both progressing more slowly than expected and that although Paulocsak's skills began to improve after about two weeks, Most's did not. Yahnert's declaration also states that Henry informed him on or about April 27 that Most still was not progressing quickly enough and that he was not performing billable work. Several days later, Yahnert discussed these concerns with Most, at least ten days before Most self-identified as having social anxiety disorder. Yahnert's declaration also states that Most "was unable to complete the training by the beginning of May 2016—more than a month after he began. This made Most the only NC Programmer that the Company has hired in at least the past eight years who could not complete the training within an approximately four-week period." Under these circumstances, we conclude that Most presented insufficient evidence that his performance issues had no basis in fact.

Most likewise fails to demonstrate pretext under the other two theories. To show that the reasons offered did not "actually motivate" BWXT's decision, Most must "present evidence 'which tend[s] to prove that an illegal motivation was *more* likely than that offered by defendant.'" *Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 20, 2007 WL 1296032, at *9 (6th Cir. 2007) (internal citation omitted). To make a showing that BWXT's reasons for terminating him were "insufficient to motivate [BWXT's] action," Most would need to provide evidence that employees

outside the protected class were not treated the same way even though they engaged in substantially identical conduct. *Id.* at \*10. Most argues that Yahnert's conversation with him on April 28, 2016 informing him that he was not adequately progressing through training "should not be dispositive of [the] entire case." He plainly does not contest that BWXT cited problems with his performance prior to his self-identification as having social anxiety disorder. He likewise does not contest that he failed to perform billable work within BWXT's expectations. He does not explain how an illegal motivation was more likely, despite the complaints regarding his unsatisfactory progression. Finally, he does not argue that a similarly situated employee enjoyed different treatment. Accordingly, this argument fails.

Most next points to the statements made by Joyce and Yahnert as evidence that the proffered reason did not actually motivate BWXT's decision to terminate him. As noted *supra* in § I, Joyce made remarks about Most's legal counsel after Most asked Joyce for Joyce's business card, and Yahnert remarked that "we all have stress in our jobs," all of which Most interpreted to be dismissive. Most relies on *Downs v. AOL Time Warner, Inc.*, No. 2:03-CV-1117, 2006 WL 162563 (S.D. Ohio, Jan. 20. 2006), for the proposition that one dismissive statement is enough to deny summary judgment. The facts in *Downs* are distinguishable, however, because the plaintiff there relied on testimony from three different representatives of the defendant, all of whom had opined about plaintiff's medical absences and questioned the plaintiff's absence frequency and the authenticity of medical need. *Id.* at \*8. Furthermore, there were no facts on the record in *Downs* indicating that the plaintiff's performance had become an issue prior to plaintiff's identification of his disability. *Id.* In any event, these statements must be viewed in context; all were made during the period of several weeks when BWXT and Most discussed in great detail Most's concerns about interacting with groups of more than three or four. Under the circumstance that BWXT engaged

in a prolonged interactive process with Most after providing him additional training well beyond the norm for NC Programmers, we conclude that these statements, although imprudent when viewed standing alone, are insufficient to show that Most's poor performance did not actually motivate BWXT's decision to terminate him. Accordingly, Most's argument fails and his retaliation claim was properly dismissed.

IV.

Most last argues that the district court erred in dismissing his claim for failure to accommodate. To establish a prima facie failure-to-accommodate claim, a plaintiff must show that 1) he or she is disabled under Ohio Rev. Code 4112.02, 2) he or she is otherwise qualified for the position, with or without reasonable accommodation, 3) his or her employer knew or had reason to know of the disability, 4) he or she requested a reasonable accommodation, and 5) the employer failed to provide the reasonable accommodation. *Stewart v. Bear Mgmt., Inc.*, 98 N.E.3d 900, 905 (Ohio Ct. App. 2017). The district court concluded that Most failed to demonstrate a genuine issue of material fact as to the second and fifth prima facie elements.

Most failed to show the second prima facie element, that he was qualified for the position with or without reasonable accommodation, *see* § II, and so his failure-to-accommodate claim fails. Because Most failed to establish the second prima facie element, it is unnecessary to consider his argument that he established the fifth prima facie element.

V.

For the reasons set forth above, we AFFIRM the district court.